Filed 6/23/14  P. v. Quiroz CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B245104 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. PA068744) |
| JOSE LUIS QUIROZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Beverly Reid O'Connell, Judge.  Affirmed as modified.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Jose Luis Quiroz of murder with special circumstances, street terrorism, and attempted kidnapping, with gang and firearm enhancements, and the court sentenced him to life without the possibility of parole, plus 35 years to life. We order the judgment modified, but affirm in all other respects.

## BACKGROUND

An information filed on August 8, 2011 charged Quiroz with the murder of Ramon Medrano Sibrian, in violation of Penal Code[1] section 187, subdivision (a), with the special circumstances of murder while engaged in a kidnapping (§ 190.2, subd. (a)(17)), intentional killing while an active gang member to further the gang's activities (§ 190.2, subd. (a)(22)), and intentional killing of a witness (§ 190.2, subd. (a)(10)) (count 1). The indictment also alleged street terrorism in violation of section 186.22, subdivision (a) (count 2); kidnapping in violation of section 207, subdivision (a) (count 3); conspiracy to commit murder in violation of section 182, subdivision (a)(1) (count 4); and attempted kidnapping in violation of sections 207, subdivision (a), and 664 (count 5). As to counts 1, 4, and 5, the information alleged that a principal personally and intentionally discharged a firearm causing death, under section 12022.53, subdivisions (d) and (e)(1). Additional firearm enhancements were alleged as to counts 4 and 5, under section 12022.53, subdivisions (b), (c), and (e). Counts 1, 3, 4, and 5 contained gang allegations under section 186.22, subdivision (b)(1)(c). Quiroz pleaded not guilty.

At trial, a Los Angeles County Sheriff's Department homicide investigator testified that he received an early morning phone call on March 20, 2010, reporting that a body had been found in the Angeles National Forest. At daybreak, the deputy drove up Little Tujunga Canyon Road in the San Gabriel Mountains foothills, where a body lay in the middle of the narrow road, sprawled out in the southbound lane just north of a dirt cutout. The dead man was faceup on his back, with his head downhill and his hands bent at his elbows with his palms near his head. The victim had multiple gunshot wounds to the head, neck, right hand, and left forearm, with what looked like tire tracks on the chest

___

[1] All statutory references are to the Penal Code unless otherwise indicated.

2

and the face. His shirt and the knees of his jeans were torn. Five nine-millimeter casings were scattered near the body, with a sixth casing 70 or 80 feet up the road. Shoe impressions going toward a gated dirt road showed the tread patterns of the victim's shoes, and 50 or 60 feet up the road were multiple tread patterns including the victim's, and moist human feces with napkins that had been used as toilet paper; a DNA analysis later matched the feces to Leopoldo Juarez. Farther up, the trail leveled off into a 15 by 30 foot area which was covered with shoe impressions. The gate, the guard rails, and a reflector panel were marked with graffiti. When the investigator interviewed Quiroz on May 20, 2010, he saw a circular tattoo on Quiroz's chest "for the Pacas, Tiny Locos 13."

Kevin Lee testified that at around 3:00 a.m. on March 20, 2010, he and a friend were driving northbound up Little Tujunga Canyon Road, when a white Toyota Corolla passed them heading south. Five to 10 minutes farther up, they saw a body on the road, lying faceup with its arms spread out. They continued to drive until they had cell phone reception, and they called 911 to report the body.

Amber Sibrian (for clarity, Amber) testified that on March 20, 2010, she learned that her brother Ramon Sibrian was dead. Sibrian had been arrested on March 7, 2010, and released two days later. Ever since, he had acted scared and was "looking around." Sibrian hung around with Jose or "Joker," Francisco Chavez or "Temper" (hereinafter Temper), "Stealer," Leopoldo Juarez or "Doe Doe," Corey Huling, and Quiroz, who she also knew as "Striker" or "Yogi." Amber knew that Sibrian had issues with his friends, and Sibrian had a black eye from a fight with Temper after his release. On March 19, 2010 Sibrian told her that his friends thought he was a rat, which to her meant telling or snitching on someone. Sibrian wanted to "make things right" with them. He left to go to a party at Joker's house and then called her twice, saying "if he don't make it back, something happened to him."

A Los Angeles Police Department (LAPD) officer testified that on March 7, 2010, he and his patrol partner saw a tan Nissan Altima with six occupants, which meant one was not wearing a seat belt. The officers conducted a traffic stop. The driver was Cory Huling, and the passengers were Temper, Jose Reyes, Sibrian, Luis (identified by a

3

different witness as David) Gomez, and Ricky Suarez. The officer asked Huling if he had contraband in the vehicle. Huling answered that there was marijuana and consented to a search of the car, during which the officers found not only the marijuana but a chrome .25-caliber semi-automatic pistol, a loaded .22-caliber rifle, a shotgun round and .22-caliber ammunition, Temper's Mexican identification and mail, and two gloves with the Pittsburgh Pirates logo, a large gold "P." A baseball hat with the same logo bore the words "Pacoima Treces," a gang in the Pacoima area. All six men were placed under arrest and taken to the station.

Leopoldo Juarez or "Doe Doe" testified under immunity that he was a friend of Jose Reyes or "Little Joker." Reyes and Quiroz were members of the Pacas Trece (Pacoima Trece) gang. Juarez was trying to join the gang's Tiny Locos clique, but had not yet been initiated or "jumped in" by fighting. Juarez knew Quiroz as "Striker" and Sibrian as "Quack-Quack" or "Pato." He also knew Temper, Huling, Suarez or "Stealer," and "Duende." On March 19, 2010, he arrived after dark at a party at Reyes's house. After hanging around, drinking, and smoking marijuana, Juarez left the party with Quiroz, Suarez, Sibrian, and Temper. Quiroz drove them to a place in the mountains that Juarez knew as Trece Rock, with Sibrian in the middle of the back seat. Juarez and Sibrian were going to get a disciplinary "calientada," or two-on-one beating. When they arrived at Trece Rock, Quiroz pulled up to the gate. Juarez defecated inside the gate, wiped himself with a napkin, and came back down to the others. All the men went up the hill, and Sibrian "got his calientada" from Juarez and Suarez. Juarez did not get a beating, because Quiroz said he was too small.

The men returned to the car and talked about what they would do, and decided to go further up the road. Quiroz drove them up a ways and then turned back, stopping for Sibrian to go to the bathroom. Sibrian got out and so did Temper, and then Juarez heard one or two shots. Quiroz gasped and looked surprised. In the light from the car's headlights, Juarez saw Sibrian running down the road. He heard three more gunshots, and saw Sibrian fall face first; Juarez hid his face. Temper got into the car and as Quiroz,

4

looking scared, drove them down the hill, Temper said, "'You guys say anything, you know what's coming,'" which Juarez took as a threat. They went back to the party.

Juarez knew that if a gang member snitched, "[b]ad things happen," such as "beatings or murder." He also knew the gang frowned on taking methamphetamine. After March 20, 2010, he told everyone that he no longer wanted to be part of the gang.

Huling testified that he was a friend of Reyes, Temper, Quiroz, "Happy," Juarez, and Duende, all of whom except Temper were affiliated with the Tiny Locos clique of the Pacas Trece gang. Huling was not a gang member although he "kind of started to try to get affiliated." In early 2010, Huling learned that the rules of the gang included "no snitching, no lying, no doing hardcore drugs," with punishment ranging from getting beat up all the way to getting killed, by the gang or by whoever they elect. Quiroz had been in control of the clique during a period when other Tiny Locos leaders were in custody.

On the day of the traffic stop, Huling was driving his Altima when they were pulled over. He watched as the police recovered the guns from the car, but claimed that he did not know they were there. He and the others were taken to the police station, where Huling was put in a holding cell with Sibrian and Gomez. Another man in the holding cell took out some crystal meth, and Sibrian crushed it on the floor and sniffed it. After Huling was questioned, he was returned to another jail cell, with Sibrian, Temper, and Gomez. Sibrian "started going crazy" as the methamphetamine kicked in, and yelled, "'Guys, you fucked up. Temper, you fucked up. There is a gun in the basket. There is a gun in the basket,'" referring to a clothes basket outside the cell. Temper tried to calm him down but Sibrian kept yelling, insisting that someone in the basket was looking at him. Temper told Sibrian to shut up and pushed him a bit. Sibrian yelled, "'I don't trust you.'" Temper sat down, and Sibrian hopped into Huling's bunk, saying, "'Cuddle with me.'" Sibrian calmed down and then "started getting really, really crazy," banging on the wall and saying, "'Let me out.'" The jailer took him out of the cell. Huling heard Temper say "pinche rata," which means "fucking rat." Sibrian continued to bang on the door and the gate of another cell.

5

Two to three days later they were released. Later, at Huling's house, the group discussed "how [Sibrian] went crazy." Temper was angry, but Quiroz did not appear to be angry. The punishment was that Sibrian "got whupped" by Temper in a one-on-one calientada in the back yard. When they came back in, Sibrian had a big lump on his head and was bleeding and bruised, with a black eye. After that day, Sibrian acted "weirded out," quiet instead of "ditsy" and talkative. A week after their release, Sibrian told Huling, "'I think they're going to kill me.'"

On March 19, Huling went to Reyes's party. He left after seeing Quiroz, Reyes, and Temper. Huling had been up to the turnout on Little Tujunga Canyon Road before, with Reyes, Temper, and Sibrian. At night, it was very dark. He had seen Quiroz with a black nine-millimeter semi-automatic gun, similar to People's exhibit 54. After March 20, Quiroz offered the gun to Temper for protection. Later, Quiroz told Huling that Temper sold the gun, which angered Quiroz. Huling saw Temper a few days after March 20, but within a week he had disappeared.

Reyes testified under immunity that he had been a member of the Tiny Locos clique of the Pacas Trece gang, and Quiroz had sponsored him. Juarez, Suarez, and Sibrian had not yet been initiated into the gang in March 2010. Temper was not a Pacas Trece member, but hung out with them. Quiroz had been in the gang for two years, and was the leader of the Tiny Locos. After Huling came out of jail, he told Reyes that Sibrian had taken methamphetamine and had screamed things like "'[y]ou fucked up, Temper.'" Reyes was angry because gang members were not supposed to take methamphetamine, and the penalty was a calientada or warm up. Temper told Reyes more than five times, with Quiroz present, that one of them had to "take care of" Sibrian for snitching, meaning "kill him." Temper thought Sibrian had said something about the gun charges: "It's called snitching," and the consequences were death. "[S]nitching" included cooperating with the police, and a known snitch could be taken out by any gang. Reyes asked whether Temper had paper, meaning proof such as a police report or a transcript. Reyes himself had "snitched" when questioned at the time of the arrest, but he

6

couldn't tell Temper that "[b]ecause it would get me killed." He had signed a statement which would have been "paper."

At Reyes's party on March 19, Sibrian arrived at 5:00 p.m. or 6:00 p.m., left, and then returned at 9:00 p.m., staying for 15 minutes each time. Quiroz arrived at 10:00 p.m., carrying at his waist a black gun like People's exhibit 54. Reyes took the gun away because he didn't want anything to happen inside his house. There were bullets in the clip but none in the chamber. Reyes put the gun outside on the side of the house under some bricks. Later, in a discussion between Reyes, Quiroz, Suarez, Juarez, and Temper in front of the house, Temper, who was angry, said he wanted to kill Sibrian that night, for being a snitch. Temper asked for the gun and Reyes said no. Quiroz, who did not seem angry, was silent when they discussed killing Sibrian. They decided to take Sibrian to Trece Rock. Quiroz asked for the gun back for protection and Reyes said no, but then gave Quiroz the gun when Quiroz said it would just be a calientada. Quiroz took the gun and apparently put it in the trunk of his car. Temper put his arm around Sibrian's neck and dragged him into the car. Quiroz drove the white Corolla away, with Temper in the front seat. Suarez, Juarez, and Sibrian, who was saying, "'don't let them take me,'" were in the back.

The men returned about an hour and a half later, and Reyes asked them where Sibrian was. Quiroz said they dropped him off on the corner. About a week later, Temper told Reyes on the phone that "he did what he had to do" with Sibrian. Reyes called a meeting at Quiroz's house to find out why Quiroz gave the gun to Temper. "'He said he fucked up and he did,'" and Quiroz also said that Temper shot Sibrian. Quiroz wasn't himself, sweaty and nervous. Quiroz and Reyes both had sufficient power within the gang to authorize the killing of Sibrian. Temper, who was not a Pacas Trece member, did not have authority to kill Sibrian without permission. Reyes had seen Quiroz with the rifle that was taken out of Huling's car, and saw it later with Temper.

An LAPD criminalist testified that the six casings found near Sibrian's body, and bullets and bullet fragments removed from the body, matched a gun police found hidden

on May 12, 2011 in the home of a Surenos 13 gang member. The coroner testified that Sibrian had a total of six gunshot wounds, two of which were fatal.

The investigating sheriff's deputy testified that he interviewed Quiroz on May 20, 2010, and a recording of the interview was played for the jury. Quiroz told the deputy that he had not seen Sibrian since the party and did not know what happened to him, although ever since the gun arrest the others "had issues with him because they thought he was a snitch." He initially denied going up to Trece Rock the night Sibrian was killed, but admitted he went there during the day. Quiroz then explained he was drinking with Sibrian at Reyes's party. Sibrian said he was not a snitch, and he wanted to take his "warm-up" somewhere far away, so they got into the car and headed up to Trece Rock. After the warmup, which is all that was intended, "everything got out of hand" and Temper pulled out the handgun. Sibrian initially came to Quiroz for protection, but when he ran, Temper shot him, and fired more shots when Sibrian was down. Quiroz was in shock; when Temper said "let's go, let's go, let's go," he drove back down to the party. He did not know whether he ran over Sibrian.

Quiroz told the deputy that Temper had the gun most of the time, but Quiroz had shot the gun in his back yard. Quiroz didn't bring the gun to the party, he just asked Temper to borrow it so he could hold it for a photo. Quiroz didn't know that Temper had taken the gun up the hill; he had told Temper "to leave it because we're just going to go give a warm-up and that's it."

The deputy drove Quiroz to Trece Rock and the turn-out, recording the conversation. Quiroz described the calientada, and described how as they walked back down the hill he heard a click and saw Temper pointing the black nine- millimeter gun at Sibrian. Sibrian came to Quiroz and asked him what was going on and Quiroz said he'd talk to Temper. Temper said he was just playing. When they reached the car, Sibrian was not in it. Quiroz started to drive down the hill and Sibrian popped out of the bushes. Quiroz tried to get Sibrian into the car, but he said Temper was "trippin[g] on [him]." Temper got out of the car and took the first shot, and Sibrian ran, with Temper chasing him. Sibrian fell, and Temper got back in the car. Quiroz told the deputy, "If it were up

8

to me, I would have taken the bullets for him," and "everyone was just straight up shocked." Since the killing everyone had been laying low. "They don't want them to think they snitch."

A gang expert from the LAPD explained that the Pacas Trece gang used the Pittsburgh Pirates team logo. The gang generally viewed snitching "as possibly the worst thing that you can do as a gang member," and a gang member known to have snitched or thought to be ready, able, and willing to snitch would be "open for killing[,] . . . because that's what happens to snitches." Once a gang member was identified as a snitch, any gang would be obligated to carry out the killing. The violent physical punishment for snitching did not depend on whether there was paperwork, and ranged from beating to murder, depending on the severity of the snitching. A calientada was a physical punishment against a member of the gang who did something wrong. A hypothetical crime like the one for which Quiroz was on trial would benefit the gang by strengthening the internal disciplinary structure.

A gang expert testified for the defense that a gang usually would not allow one of its members to be killed by a member of another gang even if the killer also was an associate of their gang, unless there was a "green light" from the Mexican Mafia. If an outside gang member who was also an associate of Pacas Trece killed a Pacas Trece member for being a snitch without such an external "green light," the gang would go after him and kill him.

The jury found Quiroz guilty of count 1, first degree special circumstance murder based on the intentional killing of a witness, and found the other special circumstances (kidnapping and being an active gang member furthering gang activities) not true. The jury also found Quiroz guilty of count 2, street terrorism; and count 5, attempted kidnapping. The jury was unable to reach a verdict on the charges of kidnapping (count 3) and conspiracy to murder (count 4), and those counts were dismissed. Quiroz was sentenced to life without the possibility of parole plus 35 years to life.

9

## DISCUSSION

### I. Special circumstance of murdering a witness

Quiroz argues that the evidence was insufficient to establish the special circumstance of murdering a witness, claiming that the evidence that Sibrian was killed for being a snitch or rat did not support a finding that Sibrian was killed to prevent his testimony. Section 190.2, subdivision (a)(10) provides that the penalty for first degree murder is life without the possibility of parole if the jury finds true that "[t]he victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal or juvenile proceeding, and the killing was not committed during the commission or attempted commission, of the crime to which he or she was a witness . . . ." We review the entire record in the light most favorable to the judgment to determine whether reasonable, credible evidence exists such that a reasonable jury could find the special circumstance true, and if such evidence exists, we affirm the conviction even if the jury could reasonably have reached a contrary finding. (*People v. Tully* (2012) 54 Cal.4th 952, 1006–1007.) The evidence amply supports the special finding.

Quiroz acknowledges that there was evidence that while in custody on March 7 for illegal weapons possession, Sibrian yelled that the others, including Temper, "fucked up," and that there was a gun in a clothes basket outside their cell. He also acknowledges that Huling's testimony established that Temper called Sibrian a "pinche rata," accused him of snitching about gang secrets, and wanted him killed. Further, Sibrian's sister Amber testified that Sibrian told her his gang friends thought he was going to rat. Juarez testified that "bad things happen" when a gang member snitches. Huling testified that gang rules included "no snitching." Reyes testified that Temper thought Sibrian had said something about the gun charges, and that Temper told Reyes that either he or Reyes would have to take care of, or kill, Sibrian: "It's called snitching," and the consequences were death. Reyes also testified that snitching included cooperating with the police, and that his own statement to the police constituted snitching and "would get me killed." Quiroz himself told the investigating deputy that Sibrian was perceived as a snitch, although Sibrian denied it. A gang expert testified that snitching

10

was the worst thing a gang member could do and a snitch would be "open for killing[,] . . . because that's what happens to snitches."

Despite this ample testimony that Quiroz, Temper, and the others thought Sibrian had snitched and was going to snitch about the gun charges, and that snitches face violence and death from the gang, Quiroz characterizes the evidence as showing only that Sibrian was "killed for violating the gang code of conduct by acting out inappropriately and being perceived as a snitch or rat," not to prevent his future testimony. We reject that strained and unreasonable interpretation of the evidence. The special circumstance applies when the desire to eliminate a witness is not the sole reason for the killing, and "the motive to kill a witness to a previous crime can never be incidental." (*People v. Sanders* (1990) 51 Cal.3d 471, 519–520.) The weight of the evidence supports a conclusion that Sibrian was killed because Temper, Quiroz, and the other gang members believed he had or would cooperate with the police regarding the gun charges.

Quiroz also argues that the trial court improperly instructed the jury regarding the special circumstance. The jury was instructed regarding the murder charge with CALJIC No. 3.00, which contained "equally guilty" language and clarification as follows: "Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. *Each principal, regardless of the extent or manner of participation is equally guilty.* Principals include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission or attempted commission of the crime. [¶] *When the crime charged is murder, the aider and abettor's guilt is determined by the combined acts of all the participants as well as that persons [sic] own mental state.* If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. *Similarly, the aider and abettor's guilt may be less tha[n] the perpetrator's, if the aider and abettor has a less culpable mental state*." (Italics added.)

Quiroz argues that the "equally guilty" language conflicts with the general rule that the defendant's individual culpability determines the defendant's punishment, citing

11

several homicide cases. In *People v. McCoy* (2001) 25 Cal.4th 1111, 1117, our Supreme Court explained that liability in aiding and abetting cases "is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." In *People v. Nero* (2010) 181 Cal.App.4th 504, 514, 517–518, the court concluded that *McCoy* supported the conclusion that an aider and abettor might be guilty of a lesser crime than the direct perpetrator if the aider and abettor had a less culpable mental state, agreeing with the analysis in *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164–1165. The instruction as given above included language directly informing the jury of that possibility, in response to those two cases: "[T]he aider and abettor's guilty may be less tha[n] the perpetrator's, if the aider and abettor has a less culpable mental state." (See Use Note to CALJIC No. 300.) Quiroz does not challenge this instruction as to the charge of murder. He argues that the jury was not explicitly instructed that this language applied not only to murder but also applied to the special circumstance, leaving open the possibility that the jury failed to consider Quiroz's individual mental state as to whether he intended that Sibrian be killed as a "snitch," for the purpose of preventing Sibrian from being a witness.

Quiroz did not raise this specific objection to the instructions, although his counsel did object to including CALJIC No. 300 at all, on the ground that the instruction "needlessly complicat[ed] matters." We see no error in the instructions as given.

We review the entirety of the instructions, and if we conclude that the meaning of the instructions as given was unobjectionable, they are not erroneous. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) The "test [is] whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel. [Citations.]" (*Ibid.*)

The court instructed the jury that *if* it found Quiroz guilty of first degree murder, it must also decide whether any of the special circumstances is true. The jury was also instructed that to find Quiroz guilty of any special circumstance as defined in other instructions, the prosecution must prove that "he acted with a particular intent or mental state." The instruction regarding the special circumstance of murder of a witness stated

12

that the prosecution must prove "[t]he defendant intended to kill Ramon Sibrian; [¶] . . . [¶] AND [¶] . . . The defendant intended that Ramon Sibrian be killed to prevent him from testifying in a criminal proceeding . . . ." These instructions made clear that to find the special circumstance true, the jury must find that *Quiroz's own* mental state was that he intended that Sibrian be killed to prevent him from testifying. Further, no aiding and abetting language with the "equally guilty" language was included as to the special circumstance of murder of a witness (therefore avoiding what Quiroz objected to as "needlessly complicating matters" when he objected to the giving of CALJIC No. 300 as to the murder charge). We conclude there is no reasonable likelihood that the jury misconstrued the instructions' clear directive that the relevant mental state for the special circumstance was Quiroz's.

## II.     Enhancement for principal using a firearm

The jury found Quiroz guilty of first degree murder, and found true that a principal had personally and intentionally discharged a firearm causing great bodily injury and death to Sibrian. Quiroz argues that this violated the double jeopardy clause and California's prohibition against multiple convictions, and the imposition of punishment for the firearm use enhancement also violated the double jeopardy clause.

The double jeopardy clause of the Fifth Amendment states that no "person shall be subject for the same offence to be twice put in jeopardy of life or limb . . . ." Its protections against a second prosecution for the same offense after acquittal or conviction, and against multiple punishments for the same offense (*People v. Massie* (1998) 19 Cal.4th 550, 563), apply only to prohibit "the imposition of multiple *criminal* punishments for the same offense [citations] . . . . and then *only when such occurs in successive proceedings*." (*Hudson v. United States* (1997) 522 U.S. 93, 99 [118 S.Ct. 488, 139 L.Ed.2d 450] second italics added; *People v. Sloan* (2007) 42 Cal.4th 110, 121.) There were no successive proceedings; Quiroz was convicted of murder and the firearm enhancement found true in the "single prosecution" whose result he now challenges on appeal. The California Supreme Court rejected Quiroz's claim in *People v. Izaguirre* (2007) 42 Cal.4th 126, 134: "We are not here concerned with a retrial or 'second

13

prosecution,' but instead with a unitary trial in which section 954 expressly permits conviction of more than one crime arising out of the same act or course of conduct." The court also found that an enhancement was not equivalent to an offense: "Conduct enhancements cannot be imposed standing alone as additional punishment. By definition, an enhancement is 'an additional term of imprisonment added to the base term.' [Citations.] For that reason alone, an enhancement cannot be equated with an offense." (*Ibid.*) The rule against multiple convictions does not apply to enhancements, and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], requires only that the enhancements be found true beyond a reasonable doubt, as they were in this case. (*Ibid*; see *Smith v. Hedgepeth* (2013) 706 F.3d 1099, 1103–1104.) We reject Quiroz's suggestion that we disregard our Supreme Court's precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### III. Modification of judgment

Quiroz argues, and respondent concedes, that the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C), should not have been applied to counts 1 (murder) and 5 (attempted kidnapping), in addition to the firearm enhancement applied to those counts. The jury found true firearm enhancements pursuant to section 12022.53, subdivisions (b), (c), (d), and (e)(1). A gun enhancement under section 12022.53 ordinarily applies only to a defendant who personally used a gun. (*People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1424.) There is an exception, however, under subdivision (e)(1), which provides that the enhancements "apply to any person who is a principal in the commission of an offense if both of the following are pled and proven: (A) The person violated subdivision (b) of section 186.22 [the gang enhancement]. (B) Any principal in the offense committed any act specified in subdivision[s] (b), (c), or (d)." This "expands the gun enhancement's reach to cover unarmed gang members." (*Gonzalez*, at p. 1425.) Subdivision (e)(2), however, exempts those unarmed gang members from the gang enhancement's provisions: "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person *in addition* to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally

14

discharged a firearm in the commission of the offense." (Italics added.) Because Quiroz did not personally discharge a firearm, only the firearm enhancement applies. (*People v. Brookfield* (2009) 47 Cal.4th 583, 590; *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1238; *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129–1130.)

The court in this case sentenced Quiroz to 10 years for the gang enhancement on each of count 1 and count 5. This sentence was unauthorized, and the judgment must be modified to stay imposition of the 10-year enhancements.

## DISPOSITION

The judgment must be modified to stay imposition of the 10-year gang enhancement on counts 1 and 5. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, Acting P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15